UNITED STATES of America

v.

Marlene Esther SELIGSOHN, a/k/a Esther DeMarco, Appellant in No. 91–2083.

UNITED STATES of America

v.

Melvin SELIGSOHN, a/k/a Mickey DeMarco, Appellant in No. 91–2093.

UNITED STATES of America, Appellant in No. 92–1038,

v.

Melvin SELIGSOHN, a/k/a Mickey DeMarco.

UNITED STATES of America

v.

Mark SELIGSOHN, a/k/a Mark Mancini, Appellant in No. 91–2100.

Nos. 91–2083, 91–2093, 92–1038 and 91–2100.

United States Court of Appeals, Third Circuit.

Argued Oct. 6, 1992.

Decided Dec. 9, 1992.

Rehearing Denied Feb. 9, 1993.

---

Jack Zaremski (argued), New York City, for appellant Marlene Esther Seligsohn in No. 91–2083 and appellant-appellee Melvin Seligsohn in Nos. 91–2093 and 92–1038.

Peter Goldberger (argued), Pamela A. Wilk, Philadelphia, PA, for appellant Mark P. Seligsohn in No. 91–2100.

Michael M. Baylson, U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Paul J. Van De Graaf (argued), Sp. Asst. U.S. Atty., David M. Howard, Asst. U.S. Atty., Philadelphia, PA, for U.S. in Nos. 91–2083, 91–2093, 91–2100, and 92–1038.

Before: GREENBERG, COWEN and WEIS, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

In this white collar crime case, the district court imposed imprisonment terms and directed payment of substantial sums in restitution to unidentified consumer victims, as well as to certain named victims. Because the district court used the current Sentencing Guidelines for some of the counts rather than those in effect· on the dates of the offenses, we must remand for recalculation. In addition, findings on some aspects of the restitution orders are lacking and, consequently, we must remand that portion of the case as well.

Defendants, Melvin Seligsohn, his wife Marlene, and their son Mark, were charged in, a 67–count indictment with various offenses committed in the course of conducting their business. The defendants operated a number of companies engaged in roofing repair and sales in the Philadelphia area for many years. They were charged with using the mails to defraud consumers; skimming of cash receipts to pay under-the-table compensation to employees and owners; defrauding union welfare benefit plans of required contributions; paying bribes to a union shop steward; destroying company records; defrauding insurance carriers; and filing false tax returns.

The allegations of consumer fraud included such practices as schemes to sell unnecessary roofing work at excessive prices through blatant misrepresentations. For example, roofing vents which cost but a few dollars and did nothing were added to jobs at costs of hundreds of dollars. In other instances, while customers stood below, workmen would surreptitiously pour water off the roof as proof that water had been trapped below the existing roof and replacement was required. Frequently, the customers were elderly or disabled and unable to climb to the roof to verify the need for repairs.

By paying cash as part of wages earned by employees, the Seligsohns underreported their total payroll, filed false reports to the Internal Revenue Service on withholding taxes, and similarly deprived a union welfare plan of its entitlement. To carry out this scheme, the defendants bribed the union steward to secure his cooperation.

Pursuant to a plea agreement, Melvin pleaded guilty to one count of conspiracy, seven counts of mail fraud, two counts of labor bribery, three counts of obstruction of justice, one count of racketeering, two counts of submitting false employee benefit plan remittance reports, and two counts of submitting false tax returns.

Marlene Seligsohn pleaded guilty to one count of conspiracy, two counts of mail fraud, two counts of labor bribery, two counts of obstruction of justice, one count of racketeering, two counts of submitting false employee benefit plan remittance reports, and two counts of submitting false tax returns.

Mark Seligsohn pleaded guilty to one count of conspiracy, one count of mail fraud, one count of obstruction of justice, and one count of filing a false personal income tax return.

The district court imposed sentences of varying length of imprisonment and also directed restitution. On appeal, the defendants raise a number of objections to their sentences and the orders for restitution.

## I.

### RESTITUTION

The defendants contend that the district court made insufficient findings and improperly ordered payments based on charges other than those of conviction.

▮ Restitution is authorized by the Victim and Witness Protection Act, 18 U.S.C. § 3663(a), as incorporated into the Sentencing Guidelines, U.S.S.G. § 5E1.1. We exercise plenary review over whether an award is permitted under law, but we review specific awards for abuse of discretion. *United ed States v. Furst*, 918 F.2d 400, 408 (3rd Cir.1990).

In exercising its supervisory powers, this Court has required the district courts to make "findings as to the factual issues that are relevant to the application of the restitution provisions of the VWPA." *United States v. Palma*, 760 F.2d 475, 480 (3d Cir.1985). We have noted three areas where findings should be made: (1) the amount of loss actually sustained by the victim; (2) how the loss is connected to the offense of conviction; and (3) the defendant's financial needs and resources. *See Furst*, 918 F.2d at 410; *United States v. Johnson*, 816 F.2d 918, 924 (3d Cir.1987).

"Difficulties of measurement do not preclude the court from ordering a defendant to compensate the victim through some restitution." *United States v. Hand*, 863 F.2d 1100, 1104 (3d Cir.1988). We observed in that case that Congress had considered the unusual situation where the exact amount owed would be difficult to determine and authorized the court "to reach an expeditious, reasonable determination of appropriate restitution by resolving uncertainties

with a view toward achieving fairness to the victim." *Id.* at 1104 (citing S.Rep. No. 532, 97th Cong., 2d Sess. 31, *reprinted in* 1982 U.S.C.C.A.N. 2515, 2537). Such determinations should nevertheless be on the record. Hence, in *Furst*, 918 F.2d at 410, we took exception to the district court's failure to state the total amount of restitution that it had the power to impose, to identify the victims, and to explain the connection between the loss and the conduct for which the defendant was convicted.

### A.

▮ In cases where the offenses were committed before recent amendments to the Victim and Witness Protection Act, if a defendant pleads to or is convicted of less than all the counts of an indictment, the critical inquiry for restitution purposes is not the total loss sustained by the victims. Instead, courts should determine whether the loss is "caused by the specific conduct that is the basis of the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 413, 110 S.Ct. 1979, 1980, 109 L.Ed.2d 408 (1990).

The government suggests that we should follow our pre-*Hughey* case of *United States v. Woods*, 775 F.2d 82 (3d Cir.1985), where restitution was based on provisions of the Probation Act, 18 U.S.C. § 3651 (repealed). In that case, we held that where the offense is a scheme to defraud, each count of mail fraud was simply an act in furtherance of the scheme and that the trial court had the authority to direct restitution for the entire fraudulent operation. *Woods*, 775 F.2d at 88. The government points out that in *Hughey* no such scheme was implicated and, therefore, on the facts the case is distinguishable. We decline to adopt such a narrow reading of *Hughey* and, instead, decide that we should take the Supreme Court at its word that the count of conviction controls the amount of restitution. *Furst*, 918 F.2d at 410; *see also United States v. Badaracco*, 954 F.2d 928, 942–43 (3d Cir.1992); *United States v. Cook*, 952 F.2d 1262, 1264–65 (10th Cir. 1991); *United States v. Sharp*, 941 F.2d

811, 815 (9th Cir.1991); *United States v. Stone,* 948 F.2d 700, 704 (11th Cir.1991). *But see United States v. Brothers,* 955 F.2d 493, 496–97 (7th Cir.1992); *United States v. Bennett,* 943 F.2d 738, 741 (7th Cir.1991); *cf. United States v. Hunt,* 940 F.2d 130, 131 (5th Cir.1991).

Not long after the Supreme Court decided *Hughey,* Congress amended the Victim and Witness Protection Act in two respects. First, consistent with the rationale of *Woods,* when an offense involves as an element a scheme, conspiracy, or pattern of criminal activity, "victim" means a person who is directly harmed by the scheme, conspiracy, or pattern. 18 U.S.C. § 3663(a)(2); *see* H.R.Rep. No. 681(I), 101st Cong., 2d sess. 177, *reprinted in* 1990 U.S.C.C.A.N. 6472, 6583. In addition, the court is authorized to order restitution to the extent that the parties have agreed to it in a plea agreement. 18 U.S.C. § 3663(a)(3).

The amendments became effective November 29, 1990, a date which preceded the entry of the plea agreements in this case. We do not consider the amendments applicable to the Seligsohns because ex post facto considerations come into play.

Restitution under the Act is part of the sentencing process. The amendments were intended to change the *Hughey* interpretation of the statute by enlarging the courts' power to order restitution beyond that permitted by *Hughey* and, thus, work to the detriment of criminal defendants. Because of the prejudice to the defendants here, whose principal offenses were committed before the effective date of the amendments, we will not apply the statutory amendments to the restitution orders. We also note in passing that the government has not argued for application of the amendments in this case.

### B.

The district court directed Melvin to "pay his share, whatever he owes, jointly and severally as to the amount of restitution to the victims as specified by the U.S. Attorney's Office." The court then specifically identified the following debts: $426,040 to Local 30B Employee Benefit Funds, $150,-

000 to Westmoreland Casualty Company, $50,000 to UNUM Life Insurance Company, $5,000 to Standard Security Life Insurance Company of New York, $7,000 to Travelers Insurance Company, and $2,042,-880 plus interest and penalties to the Internal Revenue Service. In the formal order, the court wrote that "the total amount of restitution will be between 10 and 20 million [dollars with] ... the government to make final calculation." That total included the specific amounts previously mentioned.

As to Marlene, the court ordered her "to pay the restitution jointly and severally as follows: $426,040 owed to Local 30B Employee Benefit Funds; $150,000 owed to Westmoreland Casualty Company; $50,000 owed to UNUM Life Insurance Company; $5,000 owed to Standard Security Life Insurance Company of New York; $7,000 owed to Traveler's Insurance Company; and $2,042,808, plus interest and penalties to the United States Internal Revenue Service." The formal order of sentence as against Marlene provided: "Payment of this restitution will be made in installments as determined by the probation officer based on the defendant's future ability to pay." The court further directed: "She is to provide Probation with financial information and the Government is to look into and determine if there is anything further they can seize for forfeiture with regards to this defendant on behalf of the victims— people who have been victimized."

In directing restitution by Mark, the judge stated: "The court will not impose a fine unless they want the defendant to join with the others in making restitution to the people that make claims to be administered by the U.S. Attorney." The court's formal order reads: "The total amount of restitution, as well as the payee(s), shall be determined by the U.S. Attorney General."

█ In accordance with our precedents, the district court on remand will be required to determine the amount of restitution assessed against each defendant depending on the counts on which guilty pleas were accepted. Some of those

counts, such as the conspiracy and racketeering counts, are quite broad and will support very substantial restitution orders.[1] Other counts, however, are narrowly focused. We repeat that absolute precision when calculating the amounts of losses is not necessary and that a reasonable approximation is satisfactory if that is the only feasible way that a determination can be made. *See Hand,* 863 F.2d at 1104.

### C.

In discussing the amount of loss for purposes of calculating the pertinent sentencing score under the Guidelines, defense counsel urged the court to accept the figure of $10 million dollars as against the prosecution's claims of $20 million dollars. The district court at various points set the loss between $10 million and $20 million dollars and in one restitution order set the amount at $15 million dollars. The court properly weighed the loss caused by the entire scheme when calculating the defendants' terms of imprisonment.

*Hughey,* however, does not allow a court to use that sum as a basis for restitution. Instead, in that context the court must focus on the counts to which pleas are entered. It may be that on remand defense counsel will concede that $10 million dollars represents a reasonable approximation of the loss attributable to the various counts on which pleas were entered, but in the absence of such a stipulation the court will be required to determine an amount arising from the pleaded counts.

### D.

Determination of the losses for which restitution may be ordered will not end the district court's task. Section 3664(a) requires the court to consider "the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." A sentencing judge should make findings on the record as to these factors. *Johnson,* 816 F.2d at 924.

Here, the parties agreed to forfeit substantial assets. The district court intimates that the defendants may have hidden additional assets, but the record does not indicate their value, nor whether they will support the substantial restitution ordered. Indeed, the court stated: "I don't know if they will get the money to pay the victims unless there is more money than anyone knows about."

On remand, the court should make specific findings on the defendants' assets and ability to pay. Moreover, although the district court may disregard the potential indigence of the defendants when fashioning its order of restitution, *see, e.g., United States v. Logar,* 975 F.2d 958, 962–63 (3d Cir.1992); *United States v. Smith,* 944 F.2d 618, 623 (9th Cir.1991); *United States v. Mounts,* 793 F.2d 125, 128–29 (6th Cir. 1986), it should make additional findings to justify that order.

### E.

In addition, the court should designate recipients of the restitution. *See United States v. Miller,* 900 F.2d 919, 922–24 (6th Cir.1990). A court can easily name the victims in some cases, but not in others. If the victims are numerous and difficult to identify, the court may define an appropriate victim class and direct the United States Attorneys Office to locate the persons fitting the description.

Here, in addition to the Internal Revenue Service, insurance companies, and union benefit funds, numerous individual homeowners were victimized by the defendants. To locate and name each of them in the

---

**1.** The defendants have pleaded guilty to a conspiracy that lasted from 1975 to 1989; however, the Victim and Witness Protection Act does not apply to losses that occurred before January 1, 1983. *See United States v. Martin,* 788 F.2d 184, 188–89 (3d Cir.1986). Although restitution may be imposed under the Federal Probation Act for offenses that occurred before November 1, 1987, 18 U.S.C. § 3651, *repealed by* Act of Oct. 12, 1984, ·Pub.L. No. 98–473, Title II, § 212(a)(2), 98 Stat.1987, such restitution may not be utilized when incarceration is imposed on the same count on which restitution would be based. *See United States v. Hawthorne,* 806 F.2d 493, 495 n. 2 (3d Cir.1986).

sentencing order would complicate the process and, indeed, might constitute delay of such proportions that no restitution at all could be directed. Recognizing those difficulties, the district judge directed that payments be made to the U.S. Attorney, who would then designate the beneficiaries.

Section 3663(f)(4) provides that an order of restitution may direct a defendant to deliver the amount due to "the Attorney General or the person designated under section 604(a)(18) of title 28 for transfer to such victim." Under regulations issued pursuant to 28 U.S.C. § 604(a)(18), each United States Attorney is authorized to accept restitution for transfer to the victim.

Although a court may properly direct that payment be made to the United States Attorney as the district court did here, the unguided discretion to determine who are "victims" should not be entrusted to either the United States Attorney or the Probation Office. That is particularly true where the identity of those entitled to restitution must be determined by reference to the counts to which pleas were entered.

In a case like this, the designation of those eligible should be made by name where that is possible. Where names are unknown, designations can be made by a description specific enough to provide appropriate guidance for the United States Attorney in determining those entitled to share in the proceeds. *Cf. United States v. Grundhoefer*, 916 F.2d 788, 794 (2d Cir. 1990); *United States v. Cannistraro*, 694 F.Supp. 62, 71–72 (D.N.J.1988), *aff'd in relevant part*, 871 F.2d 1210, 1214 (3d Cir. 1989). When the total available funds will be insufficient to pay all victims, a court should also devise a system of equitable priority or pro ration.

We recognize that the restitution issues in this case are unusually complex and it is understandable that not all of the necessary findings were made. On remand we are confident that the record will be augmented to the extent necessary.

## II.

## APPLICATION OF THE GUIDELINES

All of the defendants have appealed from the sentences of incarceration alleging er-

rors in the computations under the Guidelines. We conclude that some of these claims have merit and require resentencing.

### A.

From the record, it appears that some of the offenses to which the defendants pleaded guilty may have been concluded before November 1, 1989. On that date, amendments to the Guidelines took effect and provided for the imposition of heavier penalties than those previously in effect.

■ Generally, the Guidelines in effect on the date the defendant is sentenced will be used to calculate the appropriate score. However, when retroactive application of the current version of the Guidelines results in more severe penalties than those in effect at the time of the offense, the earlier Guidelines control. *United States v. Kopp*, 951 F.2d 521, 526 (3d Cir.1991); *see also United States v. Pollen*, 978 F.2d 78, 90 (3d Cir.1992); *United States v. Chasmer*, 952 F.2d 50, 52 (3d Cir.1991).

In this case, the district court applied the post–1989 Guidelines without considering whether the offenses at issue had been committed before or after November 1, 1989. The government concedes that only the post-November 1, 1989, Guidelines were used, but defends that decision on the basis of a so-called "one book rule"—that is, only one set of Guidelines should be used in calculating the applicable total "as a cohesive and integrated whole." That so-called rule is inconsistent with *United States v. Kopp* and other cases in this Court. Focusing on ex post facto considerations, those cases have prohibited the application of more stringent penalties than were authorized at the time of the offense. Consequently, we expressly disapprove of the "one book" practice as in conflict with the *Kopp* opinion.

The government also contends that the use of pre-November 1, 1989, Guidelines will result in little, if any, change in the total points assessed and that, therefore,

we should affirm the sentences imposed. We decline to do so.

Rather than make the detailed calculations at this juncture as to the appropriate total scores for each defendant, we prefer to leave the assessment to the district court in the first instance. The parties have raised objections that require a detailed review of the appropriate factors. In the absence of stipulations, it may be that in some instances evidentiary hearings will be required. In these circumstances, we believe that the better course is to remand to the district court for re-evaluation aided by specific suggestions from counsel for the parties.

■ In determining which version of the Guidelines is applicable to specific counts, the district court should bear in mind that the conspiracy and RICO counts are "continuing offenses." *See United States v. Moscony*, 927 F.2d 742, 754 (3d Cir.1991) (RICO); *United States v. Rosa*, 891 F.2d 1063, 1068–69 (3d Cir.1989) (conspiracy). In contrast, a count for a single mailing establishes the determinative date of a mail fraud offense. *See United States v. St. Gelais*, 952 F.2d 90, 96–97 (5th Cir.1992). A similar consideration applies to the tax fraud counts.

### B.

■ Section 3D1.2 of the Guidelines provides that "[a]ll counts involving substantially the same harm shall be grouped together." The purpose is to impose "incremental punishment for significant additional criminal conduct," but at the same time prevent double punishment for essentially the same conduct. *United States v. Toler*, 901 F.2d 399, 402 (4th Cir.1990) (citing U.S.S.G. Ch. 3, Pt. D, intro. comment.).

Subsections (a) and (b) of section 3D1.2 allow grouping when a victim of two or more counts is the same. Subsection (d) allows grouping when "the offense level is determined largely on the basis of the total amount of harm or loss" and lists a number of offenses at issue here which fit into that category, including tax evasion, mail fraud, and bribery. Essentially, the Guidelines

focus on "Groups of Closely–Related Counts." U.S.S.G. § 3D1.1.

The district court grouped the counts according to the three principal offenses: mail fraud, bribery, and tax evasion. The defendants contend that because those offenses are listed under subsection (d) and all involve monetary loss, the counts should have all been grouped together.

We observe first that the three groups of offenses involved different victims—the mail fraud involved homeowners, the bribery involved the union, and the tax evasion involved the government. Grouping under (a) or (b) would have, therefore, been improper. *See United States v. Astorri*, 923 F.2d 1052, 1056 (3d Cir.1991).

Moreover, although all of the counts are listed in subsection (d) as appropriate for grouping, that inclusion does not mean that the counts must be grouped. *See United States v. Harper*, 972 F.2d 321, 322 (11th Cir.1992) (grouping under subsection (d) is not automatic). Counts must be of the "same general type" before grouping is appropriate. *Id.; see also United States v. Patterson*, 962 F.2d 409, 416–17 (5th Cir. 1992); *United States v. Porter*, 909 F.2d 789, 793 (4th Cir.1990).

It is clear that although the mail fraud counts involved many victims, the nature of the offense as to each was similar. The mail fraud counts were, thus, appropriately grouped together. On the other hand, the tax evasion counts differed in nature and were not an essential part of or related to the mail fraud. The tax evasion counts also affected different victims. Similarly, the bribery of a union official differs substantially from tax evasion. Although the mail fraud counts could be appropriately grouped together, they cannot be combined further with the tax evasion or bribery counts.

In *United States v. Cusumano*, 943 F.2d 305, 313 (3d Cir.1991), we concluded that a determination of whether "various offenses were part of one overall scheme" is essentially a factual issue which we review under a clearly erroneous standard. The defendants have failed to persuade us that the district court's grouping was clearly

erroneous. Our decision to uphold the court's grouping of the counts is further influenced by the fact that when reviewing the appropriateness of a grouping, deference must be given to the district court. *United States v. Beard*, 960 F.2d 965, 969 (11th Cir.1992).

Because the sentences must be reviewed on remand, however, we point out that before grouping the various offenses to determine the score, the district court must first apply the applicable Guidelines for each offense. In other words, if some of the offenses occurred before November 1, 1989, the Guidelines appropriate for that period of time must be used before those offenses are grouped with violations occurring after November 1, 1989. *See* U.S.S.G. § 1B1.1(a)–(d). Through this method the defendants are given the leniency required by ex post facto considerations.

### C.

■ Melvin and Marlene Seligsohn contend that their sentences were substantially in excess of the maximum stated during the plea colloquy. This allegation is the result of a stenographic error in the transcript that stated the maximum sentences in terms of "months" rather than "years." The transcript has since been corrected by the district court and leaves no doubt that the maximum permissible terms of imprisonment were accurately stated at the plea colloquy. After reviewing the matter closely, we are completely satisfied that the original transcript was faulty and that the Seligsohns were, in fact, aware of the actual possible maximum sentences.

Marlene Seligsohn, in addition, said she was coerced into pleading guilty by threats that if she did not agree to a bargain, the government would not allow her husband to enter a plea. Mrs. Seligsohn has not filed a motion to set aside her plea and, therefore, the matter is not properly before us. In any event, we note that she did admit to guilt during the sentencing hearing as well as during the plea colloquy. Moreover, in the circumstances here, the government could appropriately bargain for a "package deal" as part of the plea agreements. Package deal plea bargains, in which a prosecutor makes an agreement with one defendant contingent upon a co-defendant also pleading guilty, are permissible provided that the defendant's decision to forego a trial is otherwise voluntary. *See United States v. Marquez*, 909 F.2d 738, 741–42 (2d Cir.1990); *United States v. Wheat*, 813 F.2d 1399, 1405 (9th Cir.1987), *aff'd*, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988).

### D.

■ Melvin Seligsohn contends that the district court erred in granting a two-level enhancement under section 3A1.1 on the basis that he "knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct." *See United States v. Boult*, 905 F.2d 1137, 1139 (8th Cir.1990).

Whether a victim is particularly vulnerable to certain types of criminal conduct is inherently a factual determination subject to a clearly erroneous standard of review. *Astorri*, 923 F.2d at 1055. The defendant's consumer fraud scheme depended in many instances on the inability of elderly homeowners to verify the need to repair or replace roofs. There was adequate evidence in the record to sustain a finding that the defendants preyed on those particularly vulnerable individuals. We cannot conclude that the district court's determination was erroneous.

### E.

Melvin Seligsohn argues that his sentence was improperly enhanced because of an imprecise calculation of the loss attributable to the consumer fraud scheme. The district court adopted the presentence report that based the offense calculation on a consumer fraud amount exceeding $20 million. However, the parties stipulated and the court accepted that the amount of the consumer fraud was between $10 million and $20 million. When sentencing Mr. Seligsohn, the district court overlooked the

stipulation and used the guideline range in the presentence report that posited fraud greater than $20 million. On remand, the district court should correct this error.

### F.

■ Melvin and Marlene Seligsohn contend that the district court sentenced them on the tax fraud counts for an offense with which they were never charged and that this violated due process. The indictment against the defendants did not allege any corporate tax evasion, but charged violations based only on personal tax fraud conspiracy violations. Thus, the defendants argue that the district court erred in computing their sentences based upon a tax loss attributable to the defendants' companies rather than using the amounts of individual tax loss.

We conclude that the tax fraud conspiracy mentioned in the indictment was clearly intended to encompass the tax losses attributable to the employees of the defendants' companies as well as the losses from the defendants' own personal tax evasion. The Seligsohn's cash skimming scheme defrauded the Internal Revenue Service out of the taxes owed by those employees receiving cash, as well as the defendants. We find that the district court properly computed the offense level for the tax fraud count based on the tax loss from the entire scheme.

### G.

■ Melvin and Marlene contend that the district court erred in failing to articulate the standard applied to the evidence as it went to the dollar amount of tax evasion and consumer fraud. They assert that because of the upward departures triggered by the large sums involved, the clear and convincing standard of *United States v. Kikumura*, 918 F.2d 1084, 1101 (3d Cir. 1990), should apply rather than the preponderance standard of *United States v. McDowell*, 888 F.2d 285, 291 (3d Cir.1989).

The district court did not articulate the standard it used, but even assuming that the evidence met at least the preponderance standard, in the circumstances it was adequate. It is important to understand that much of the difficulty in determining the amount of money involved in the fraud and tax counts was the direct result of the defendants' mass destruction of company records—an action that formed the basis for the obstruction of justice charges. It comes with poor grace, therefore, for the defendants to assert a lack of convincing evidence when they systematically destroyed pertinent data.

The government did submit extremely detailed affidavits by special agents of the Department of Labor and the Internal Revenue Service describing the information secured from many witnesses, including some of the co-defendants. The agents also supplied an analysis of the remaining records of the roofing companies. During the sentencing proceedings, the district judge offered defense counsel the opportunity to cross-examine the agents. Counsel declined the offer, preferring instead to submit counter-affidavits. Moreover, at the sentencing hearing, defense counsel urged the court to use $10 million as the pertinent amount for purposes of assessing the impact of consumer fraud on the Guideline calculations.

We conclude that, in these circumstances, Melvin's and Marlene's contentions about the standard of proof lack merit.

### H.

■ Mark Seligsohn maintains that the government breached its agreement to recommend a downward departure based upon his cooperation with the prosecution. The government responds that it refused to move for a departure because after entering a plea agreement, the defendant engaged in insurance fraud. Mark applied for and received disability payments from an insurance company although he continued to receive money from one of the roofing companies indirectly through his wife who worked there. In addition, Mark furnished erroneous information to a bank in connection with a loan application. The prosecution contends that this continuing criminal activity impaired Mark's credibility as a witness and demonstrated a lack of cooperation.

We have made it clear that the government must abide by the terms of a plea agreement, *United States v. Hayes*, 946 F.2d 230, 233 (3d Cir.1991), and may not fail to meet its commitment because "it decides after the fact that it has made a bad bargain." *United States v. Badaracco*, 954 F.2d 928, 941 (3d Cir.1992). The defendant contends that his subsequent criminality did not violate his plea agreement or affect his standing as a potential government witness because the government had known his previous character was poor. This argument strikes us as chutzpah, rather than legal justification.

As part of his bargain, Mark agreed to cooperate with the prosecution in exchange for the government's promise to move for a downward departure. His obligations required him to disclose his knowledge of, and participation in, any crimes about which he had knowledge and to "provide truthful, complete, and accurate testimony and information."

Mark concealed his criminal conduct that occurred after signing the plea agreement and affirmatively lied to the government. He argues, nevertheless, that in context, the plea agreement obligated him to provide information only about the criminal conduct of other persons who were being prosecuted. However, the language of the plea agreement refers to his disclosure of "any crime about which he has knowledge" and is not limited to those of co-defendants. Promising to cooperate with the government was inconsistent with continuing involvement in criminal conduct. In these circumstances, the defendant's conduct relieved the government of its obligation to move for a downward departure, one that is difficult to believe the sentencing court would have granted in any event.

## I.

Finally, we come to the government's cross-appeal complaining that the district court erred in granting a downward departure to Melvin because of his age and

health. At the time of the sentencing, Melvin Seligsohn was 62 years of age, but was not alleged to be in poor physical health. Although the Guideline imprisonment range was 168 to 210 months, the district court reduced the sentence to 150 months because of Mr. Seligsohn's age, and to reduce disparity with the punishment assessed against co-defendants.

■ Under section 5H1.1, departures on the basis of age are not normally permitted, *United States v. Higgins*, 967 F.2d 841, 845 (3d Cir.1992), but are permissible, for example, when the defendants are elderly and infirm and home confinement is equally efficient as well as being less costly. The record here does not demonstrate that appropriate findings were made to sustain a downward departure on this ground alone.[2]

In *United States v. Nelson*, 918 F.2d 1268, 1271–72 (6th Cir.1990), the Court of Appeals for the Sixth Circuit held that departures to reduce disparity between defendants were permissible because Congress' purpose was to eliminate "illogical, unjust, and unwarranted disparity." *See also United States v. Daly*, 883 F.2d 313, 319 (4th Cir.1989). However, the Court of Appeals for the Second Circuit in *United States v. Restrepo*, 936 F.2d 661, 670–71 (2d Cir.1991), and *United States v. Joyner*, 924 F.2d 454, 460–61 (2d Cir.1991), concluded that Congress was more concerned with promoting national uniformity than with disparity among defendants in the same case. *See also United States v. Arlen*, 947 F.2d 139, 147 (5th Cir.1991).

A panel of this Court chose to adopt the reasoning of the Court of Appeals for the Second Circuit in *United States v. Higgins*, 967 F.2d 841, 845 (3d Cir.1992) (decided after the sentences were imposed in the case at hand). We are bound by the *Higgins* precedent and, accordingly, must hold that, as a general proposition, sentence disparity among co-defendants is not a sufficient basis for departure.

In this case, however, we are unable to determine from the record whether there

---

**2.** Speaking for himself, the author of this opinion is baffled by the government's conduct in complaining about the fact that Melvin would be released from prison when he would be about 72 years of age, rather than about 74 as the Guidelines would require. This overkill is another example of the untoward effects caused by the unnecessary rigidity of the Guidelines.

are unusual circumstances that would constitute an exception to the rule. At sentencing, the district judge said with respect to Melvin's sentence: "Because the Government asks for a downward view of the guidelines in some of the other people that were involved and were as much involved as he in some cases, the court will impose the following sentence: ... 150 months, I think, will suffice because of the time he will spend in prison for what has happened here."

We are well aware that the Guidelines have transferred much discretion in the sentencing process from the courts to the prosecution. However, we do not believe that Congress intended that shift to be so drastic as to give the prosecution the power to bring about downward departures for some defendants while opposing like treatment for co-defendants similarly situated.

Because the district court did not cite the instances in which the government asked for downward departures and the similarities between those co-defendants and Melvin, we are unable to determine at this time whether there is an adequate basis for recognizing an exception to the *Higgins* rule. An elaboration by the district court is particularly important here because there were fifteen co-defendants named in the indictment in addition to the three parties to these appeals. To our knowledge, all pleaded guilty and were sentenced within the same period of time. On remand, therefore, the district court shall review this facet of the sentence computation in the light of *Higgins* and this opinion, keeping in mind Melvin's leadership role.

In view of the lack of findings on restitution and necessary review of the calculations under the Guidelines, this case will be remanded to the district court for proceedings consistent with this opinion.

## SUR PETITION FOR REHEARING BEFORE ORIGINAL PANEL

### Feb. 9, 1993.

The petition for panel rehearing filed by appellee in the above entitled case having been submitted to the judges who participated in the decision of this court, and no judge who concurred in the decision having asked for rehearing, the petition for rehearing is denied.